IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES MORTON and DEBORAH MORTON, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Civil Action No. 19-1174<br>) |
| WARREN E. GARDNER, | )<br>) |
| Defendant, | )<br>) |
| v. | )<br>) |
| LIBERTY MUTUAL INSURANCE COMPANY, | )<br>)<br>) |
| Garnishee | ) |

## MEMORANDUM OPINION

### I. Introduction

In this insurance coverage matter, Plaintiffs James and Deborah Morton (the "Mortons") are attempting to collect their state court personal injury judgment against Garnishee Liberty Mutual General Insurance Company ("Liberty Mutual"). The central dispute between the parties is whether Defendant Warren Gardner is entitled to coverage and indemnity for the Mortons' losses, and turns on whether Gardner's property falls within the meaning of "vacant land" in his homeowners' insurance policy.

Pending before this Court are Plaintiffs' and Garnishee's Cross Motions for Summary Judgment. (Docket Nos. 26; 29). After careful consideration of the parties' arguments and for the following reasons, the Court grants Liberty Mutual's Motion for Summary Judgment and denies the Mortons' Motion for Summary Judgment. Specifically, the Court concludes that, under either

Georgia or Pennsylvania law, Liberty Mutual has demonstrated that there are no genuine issues of material fact and the property at issue does not constitute "vacant land" under the relevant insurance policy.

## II. Background

### a. The Underlying Litigation

The present garnishment action arises out of a lawsuit captioned *James Morton and Deborah Morton v. Warren E. Gardner*, which was filed in the Court of Common Pleas of Lawrence County, Pennsylvania at Docket No: 11198 of 2017, C.A. (Docket Nos. 28 at ¶ 1; 34 at ¶ 1). This underlying litigation stemmed from an incident that occurred on State Route 2003 (also known as Wurtemburg Road) in Wayne Township, Lawrence County, Pennsylvania on January 10, 2016. (*See* Docket No. 1-2). The Defendant, Warren E. Gardner, is a citizen of Georgia who inherited parcels of land in Wayne Township from his father's estate in 2002 (the "Pennsylvania Property"). (Docket Nos. 28 at ¶ 3, 19; 34 at ¶ 3, 19). Gardner testified that he had returned to the Pennsylvania Property approximately three times between 2002 and 2016. (Docket Nos. 28 at ¶ 21; 34 at ¶ 21). He explained that the Pennsylvania Property contained five dilapidated structures that he did not use to store equipment, animals, or property of any kind. (Docket Nos. 28 at ¶¶ 25-29, 32-35; 34 at ¶¶ 25-29, 32-35). He also did not rent out the property or structures to others. (Docket Nos. 28 at ¶¶ 30-31; 34 at ¶¶ 30-31).

One of these parcels of land contained a visibly dead tree, located near Wurtemburg Road. (Docket Nos. 28 at ¶ 3; 34 at ¶ 3). On the date of the incident, James Morton was driving on Wurtemburg Road when the dead tree came crashing down upon his vehicle, causing him to sustain severe and permanent injuries. (Docket Nos. 28 at ¶ 4; 34 at ¶ 4).

    b.  **The Policy**

At the time of the incident, Gardner owned and resided at 1115 Jefferson Highway, Winder, Georgia, 30680-3027, which was insured by Liberty Mutual (Docket Nos. 28 at ¶ 5; 34 at ¶ 5). This homeowners' insurance policy, number H3S-258-333613-40 7 4 (the "Policy"),[1] includes the following sections on Liability Coverage:

> **COVERAGE E - Personal Liability.** If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:
> 1. Pay up to our limit of liability for the damages for which the "insured" is legally liable. Damages include prejudgment interest awarded against the "insured"; and
> 2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the "occurrence" equals our limit of liability.
>
> **COVERAGE F - Medical Payments To Others.** We will pay the necessary medical expenses that are incurred or medically ascertained within three years from the date of an accident causing "bodily injury." Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household except "residence employees." As to others, this coverage applies only:
> 1. To a person on the "insured location" with the permission of an "insured"; or
> 2. To a person off the "insured location," if the "bodily injury":

---

[1] The Mortons filed a copy of the insurance policy covering the term 2/10/2017 to 2/10/2018. (*See* Docket Nos. 28-3; 28-4). However, this is not the correct policy as the incident took place on 1/10/2016. (*See* Docket No. 1-2). The controlling insurance policy is the one Liberty Mutual filed, covering the term 2/10/2015 to 2/10/2016, as this is an occurrence-based policy. (*See* Docket No. 29-5 ("This policy applies only to . . . 'bodily injury' or 'property damage' . . . which occurs during the policy period."). The Mortons' copy has an additional endorsement entitled "Special provisions – Georgia (FMHO6100GA 1016)" that replaces the definition of "insured location" item e. with: "vacant land, including that which is vacant except for a fence, owned by or rented to an 'insured' other than farmland.'" (*See* Docket No. 28-4). Other than this endorsement, the two versions are the same in all material respects. (*See* Docket Nos. 28-4; 29-5).

    a. Arises out of a condition on the "insured location" or the ways immediately adjoining;
    b. Is caused by the activities of an "insured";
    c. Is caused by a "residence employee" in the course of the "residence employee's" employment by an "insured"; or
    d. Is caused by an animal owned by or in the care of an "insured."

("Liberty Mutual Insurance Policy," Docket No. 29-5). As to "others" (the Mortons, in this case), the coverage applies to a person off the insured location if the bodily injury arises out of a condition on the insured location (here, the arguably dead tree) or ways immediately adjoining. *Id*. The Policy also excludes the above two sections "to [o]thers" when the "bodily injury" "aris[es] out of a premises that is not an 'insured location.'" *Id.*

Thus, the definition of "insured location" is key to this case. The Policy defines an "insured location" as follows:

    a. The "residence premises";
    b. The part of other premises, other structures and grounds used by you as a residence and: (1) Which is shown in the Declarations; or (2) Which is acquired by you during the policy period for your use as a residence;
    c. Any premises used by you in connection with a premises in 4.a. and 4.b. above;
    d. Any part of a premises: (1) Not owned by an "insured"; and (2) Where an "insured" is temporarily residing;
    e. **Vacant land, other than farm land, owned by or rented to an "insured";**
    f. Land owned by or rented to an "insured" on which a one or two family dwelling is being built as a residence for an "insured";
    g. Individual or family cemetery plots or burial vaults of an "insured"; or
    h. Any part of a premises occasionally rented to an "insured" for other than "business" use.

(*Id.*) (emphasis added). Under subsection (a), the "residence premises" means where Gardner resides, i.e., 1115 Jefferson Highway, Winder, Georgia, 30680-3027. ("Liberty Mutual Declarations Page," Docket No. 29-5). The parties do not dispute that Gardner owned the

4

Pennsylvania Property.[2] (Docket Nos. 28 at ¶ 3; 34 at ¶ 3). They dispute whether it falls under subsection (e). (*See* Docket Nos. 27; 30).

    c. **Procedural History**

Following the incident, Gardner placed Liberty Mutual on notice of the Mortons' claims and demanded coverage and a defense pursuant to the Policy. (Docket Nos. 28 at ¶ 9; 34 at ¶ 9). Liberty Mutual subsequently denied coverage, writing that the Pennsylvania Property was not an "insured location" since it was not "vacant land." (Docket Nos. 28 at ¶ 10; 34 at ¶ 10). Liberty Mutual reasoned the Pennsylvania Property was "not vacant" because structures existed on the property. (Docket Nos. 28 at ¶ 10; 34 at ¶ 10).

The underlying state court action ultimately proceeded to trial on June 20, 2019, and the trial court awarded damages in favor of the Mortons in the amount of $212,886.49. (Docket Nos. 28 at ¶ 11; 34 at ¶ 11). Delay damages were also awarded pursuant to Pa. R.C.P. 238. (Docket Nos. 28 at ¶ 14; 34 at ¶ 14). On August 1, 2019, judgment was entered in favor of the Mortons and against Gardner in the total amount of $220,635.54. (Docket Nos. 28 at ¶ 15; 34 at ¶ 15). Gardner executed an assignment, transferring his rights to the Mortons to proceed directly against Liberty Mutual.[3] (*See* Docket No. 29-10). The Mortons filed a Writ of Execution against Liberty Mutual, seeking to recover the amount of the judgment, together with interest at a rate of six percent per annum from June 20, 2019. (*See* Docket No. 34-2).

---

[2] There is no information in the record that the Pennsylvania Property was ever added to Gardner's insurance policy.

[3] Although the Policy states that an "[a]ssignment . . . will not be valid unless [Liberty Mutual] give[s] [its] written consent," (*see* Docket No. 29-5), the record is bare as to the issue of consent and Liberty Mutual has not moved for summary judgment on this issue. Therefore, it is not presently before the Court.

Liberty Mutual removed this matter to the United States District Court for the Western District of Pennsylvania on September 5, 2019. (Docket No. 1). Fact discovery concluded on March 31, 2020. (Docket No. 23). At the conclusion of discovery, the parties filed cross motions for summary judgment, supporting briefs, and concise statements of material facts. (Docket Nos. 26-31). Responsive briefs and counterstatements of fact followed. (Docket Nos. 33-36). The parties declined to file reply and sur-reply briefs. Accordingly, the pending cross motions for summary judgment are now ripe for disposition.

### III.    Standard of Review

Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact is one that could affect the outcome of litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita*, 475 U.S. at 587). When considering the parties' arguments, the court is required to view all facts and draw all inferences in the light

6

most favorable to the non-moving party. *Id*. (citing *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962)). The benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats Co*., 434 F. App'x 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs. Inc*., 44 F.3d 195, 200 (3d Cir. 1995)).

The non-moving party must resort to affidavits, deposition testimony, admissions, and/or interrogatories to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citing *Celotex Corp*., 477 U.S. at 324). Finally, in evaluating a summary judgment motion, the district court "may not make credibility determinations or weigh the evidence." *Id*. (citing *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000)). Given these standards, summary judgment is warranted in favor of Liberty Mutual, here.

### IV.  Discussion

In a third-party garnishment action, the injured plaintiffs are not suing in their own right but are assignees of the insured and, as such, stand in his shoes. "It is the insured who has allegedly suffered the wrong at the hands of the insurer." *Gray v. Nationwide Mut. Ins. Company*, 223 A.2d 8, 13 (Pa. 1966). Thus, in order for the Mortons to succeed on this action, they have the burden to demonstrate that Gardner is entitled to insurance coverage under the Policy for their losses.

As a threshold matter, the Court notes that the Policy does not contain an express choice-of-law provision. (*See* "Liberty Mutual Insurance Policy," Docket No. 29-5). The parties disagree as to whether Pennsylvania or Georgia law governs. (Docket Nos. 27 at 13; 30 at 5). Accordingly, the Court must first undertake a choice-of-law analysis to determine which state's law applies before determining whether the Pennsylvania Property is covered under the Policy. Having carefully considered the parties' arguments, this Court concludes that because there is no "actual"

conflict of law, it may refer interchangeably to the laws of Georgia and Pennsylvania, and the Pennsylvania Property does not come within the meaning of "vacant land." Hence, the losses sustained by the Mortons are not covered by the Policy.

### a. Choice-of-Law Analysis

#### i. Contours of the *Griffith* Analysis

"In a diversity of citizenship action, [the Court] determine[s] which state's substantive law governs by applying the choice-of-law rules of the jurisdiction in which the district court sits, here Pennsylvania." *Garcia v. Plaza Oldsmobile Ltd.*, 421 F.3d 216, 219 (3d Cir. 2005) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). *Griffith v. United Air Lines, Inc.*, is Pennsylvania's leading conflicts-of-law case. 203 A.2d 796 (Pa. 1964). In that case, the Pennsylvania Supreme Court abandoned the traditional *lex loci delicti* conflicts rule—under which the substantive rights of the parties had been governed by the law of the place of the wrong—in favor of a more flexible, "hybrid approach" that combines the "governmental interest analysis" with the Second Restatement of Conflict's "most significant relationship" test. *Id.* at 805-06; *see also Garcia*, 421 F.3d at 219-20; *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 (3d Cir. 1991).

While *Griffith* involved choice-of-law problems arising in tort actions, 203 A.2d at 806, Pennsylvania law has since "mandate[d that the Court] follow the *Griffith* rule in the contract law context." *Budtel Assocs., LP v. Cont'l Cas. Co.*, 915 A.2d 640, 644 (Pa. Super. Ct. 2006); *see also State Auto Prop. & Cas. Ins. Co. v. Moser*, No. 589 MDA 2017, 2018 WL 2093596, at *3 n.4 (Pa. Super. Ct. May 7, 2018) (applying *Griffith* in a "contract choice of law analysis"); *Air & Liquid Sys. Corp. v. Allianz Underwriters Ins. Co.*, No. CIV.A. 11-247, 2013 WL 5436934, at *16 (W.D. Pa. Sept. 27, 2013) ("This flexible analysis applies in cases involving contractual disputes."). In so holding, *Budtel* rejected application of the general rule that the law of the state where an

insurance contract is delivered will be the law applied in construing the contract's terms. 915 A.2d at 643-44. *Budtel* reasoned that "[t]o apply [this] rule would be to blindly adhere to [the] . . . principle . . . [that] the laws of the place where a contract is delivered control simply because the contract was delivered there." *Id*. at 644. Though the Pennsylvania Supreme Court has yet to rule on this issue, the Third Circuit has repeatedly predicted that it would apply *Griffith* to contract actions. *See e.g., Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 228 (3d Cir. 2007) ("We agree with the Superior Court and expressly reaffirm our prediction . . . that the Pennsylvania Supreme Court would apply *Griffith* to contract disputes."); *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 403 (3d Cir. 2016) (rejecting the argument that the previous "lex loci contractus" rule should control contract claim and continuing to follow *Hammersmith*'s previous prediction and apply *Griffith*'s flexible choice-of-law analysis).

However, before turning to the interest and contacts analysis, the *Griffith* approach requires the Court to first determine whether there is a relevant difference between the jurisdictions' laws that potentially apply, i.e., whether there is an actual or real conflict. *Hammersmith*, 480 F.3d at 230. If the laws of the jurisdictions are the same, "then there is no *conflict* at all, and a choice of law analysis is unnecessary." *Id*. (emphasis in original). In the absence of a conflict, "the district court sitting in diversity may refer interchangeably to the laws of the states whose laws potentially apply." *Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006) (citing *On Air Ent. Corp. v. Nat'l Indem. Co*., 210 F.3d 146, 149 (3d Cir. 2000)).

### ii. Application of *Griffith*

In this Court's estimation, the choice-of-law analysis is straightforward because there is no "actual" conflict between Pennsylvania and Georgia law. To this end, Liberty Mutual argues that the Court should follow a Georgia Court of Appeals case interpreting the same policy language at

9

issue here. (Docket No. 30 at 6-7). In opposition, the Mortons concede that "we must examine the laws of Pennsylvania and Georgia related to insurance policy interpretation" and there are no relevant differences between the laws of the two jurisdictions. (Docket No. 27 at 8, 13). Nevertheless, the Mortons argue that the Court should not follow the Georgia case and instead resolve this dispute with reference to the plain meaning of the terms in the Policy. (*Id*. at 14-17).

Here, neither party points to any differences between Pennsylvania and Georgia law on the construction of an insurance policy relevant to this case. In addition, this Court's own research has not identified any relevant differences. In both jurisdictions, the following principles of interpretation apply.

The task of interpreting the insurance contract is generally performed by a court rather than by a jury. *Standard Venetian Blind Co. v. Am. Empire Ins. Co*., 469 A.2d 563, 566 (Pa. 1983); *First Fin. Ins. Co. v. Am. Sandblasting Co*., 477 S.E.2d 390, 391-92 (Ga. Ct. App. 1996). The goal of the Court is to ascertain the intent of the parties as manifested by the language of the written policy. *Standard Venetian Blind Co.,* 469 A.2d at 566; *Brown v. Peninsular Fire Ins. Co*., 320 S.E.2d 208, 209 (Ga. Ct. App. 1984). Where a provision of a policy is ambiguous, it is to be construed in favor of the insured and against the insurer. *Standard Venetian Blind Co.,* 469 A.2d at 566; *Georgia Farm Bureau Mut. Ins. Co. v. Smith*, 784 S.E.2d 422, 424-25 (Ga. 2016). Where, however, the language of the contract is clear and unambiguous, a court is required to give full effect to the plain meaning of that language. *Standard Venetian Blind Co.,* 469 A.2d at 566; *Payne v. Twiggs Cnty. Sch. Dist*., 496 S.E.2d 690, 691-92 (Ga. 1998).

Therefore, the Court finds there is no actual conflict of law and the Court can refer interchangeably to the laws of Pennsylvania and Georgia in discussing the law applicable to the case. *Huber*, 469 F.3d at 74. The Court now turns to its analysis of the Policy.

### b. Meaning of "Vacant Land" within the Context of the Policy

The Policy provides coverage for "insured locations," and defines the same as, *inter alia*, "[v]acant land, other than farm land, owned by or rented to an 'insured.'" ("Liberty Mutual Insurance Policy," Docket No. 29-5). The Mortons' only argument is that the Pennsylvania Property was vacant at the time of the incident, and thus was an "insured location" and covered under the Policy. For the reasons that follow, viewing the facts and drawing all inferences in the light most favorable to the Mortons, Liberty Mutual has shown that there is no genuine issue of material fact as to the definition of "vacant" under the Policy. As a matter of law, the Pennsylvania Property does not constitute "vacant land" under the Policy because it contained artificial structures.

The issue before the Court is the meaning of "vacant land" in a homeowners' insurance policy. The Policy does not define the terms "vacant" or "vacant land."[4] (*See* "Liberty Mutual Insurance Policy," Docket No. 29-5). Both parties cite to the principle of law that terms in an insurance policy should be defined in accordance with their plain or ordinary meaning. (*See* Docket Nos. 27 at 14; 30 at 6); *see also Cotton States Mut. Ins. Co. v. Smelcer*, 441 S.E.2d 788, 789 (Ga. Ct. App. 1994). However, the parties disagree on what the ordinary meaning of vacant is, and thus whether the Pennsylvania Property falls within that meaning.

Citing to the Merriam-Webster dictionary, the Mortons first argue that the ordinary meaning of vacant is "unoccupied." (Docket No. 27 at 14-15). Because Gardner testified that no person ever resided at the Pennsylvania Property, nothing was ever stored there, and it was not used for any purpose, the Mortons conclude that the Pennsylvania Property comes within this

---

[4] "Vacant land" does not appear anywhere else in the Policy. (*See* "Liberty Mutual Insurance Policy," Docket No. 29-5). "Vacant" is used elsewhere in the Policy but to modify the term "dwelling." (*Id.*)

definition. (*Id*. at 15). The Mortons next contend that the term vacant is ambiguous in nature, because "[a] plain reading of the Merriam-Webster's dictionary definition" shows that "[r]easonable persons could differ as to its meaning." (*Id*.). Because ambiguous terms in insurance contracts must be construed in favor of the policyholder and against the insurance company, the Mortons maintain that the Pennsylvania Property must be covered under the Policy. (*Id*. at 15-16).

Liberty Mutual argues that the ordinary meaning of vacant is "to be empty, be free," and that the presence of the buildings on the Pennsylvania Property precludes it from being classified as vacant. (Docket No. 30 at 6-7). Liberty Mutual relies on *Cotton States Mutual Insurance Co. v. Smelcer*, where the Georgia Appellate Court held that "land which contains [a] permanently affixed but abandoned structure was not 'vacant land' for purposes of coverage under [a] homeowner's liability policy." 441 S.E.2d at 788.

This Court agrees that *Cotton States* is illustrative to the issue before it. In that case, the insured, Smelcer, owned a residence that was insured under a homeowner's policy issued by Cotton States Mutual Insurance Company. *Id*. He and other family members also owned a separate parcel of land located a few miles from the residence, where an abandoned house and an abandoned country store were located. *Id*. During the term of the insurance policy, vandals set fire to the abandoned house and a responding fireman was killed. *Id*. The deceased fireman's father sued Smelcer, and Smelcer claimed coverage under the insurance policy, which defined "insured location" as, *inter alia*, "vacant land, other than farm land, owned by or rented to an insured." *Id*. The term "vacant land" was not defined in the insurance policy. *Id*.

The parties' arguments in *Cotton States* are nearly identical to those in the present case. Cotton States asserted that because the separate parcel of land contained a house, it was not "vacant

land." *Id*. Smelcer maintained that he understood "vacant land" to mean "unoccupied or unused land." *Id*. at 788-89.

Applying well-settled principles of contract interpretation, the Georgia Court of Appeals wrote that "[t]he term 'vacant' is readily understood in its plain, ordinary and popular sense." *Id*. (citing to Webster's Third New Intl. Dictionary definition of "to be empty, be free"). The court concluded that the land was not vacant, reasoning that "[i]nsurance is a matter of risk assessment and risk taking [and] [t]he presence of an affixed artificial structure on land, unoccupied, substantially alters the liability risk on the land." *Id*. The court further noted the text of the insurance policy, highlighting the fact that the word "vacant" modified the word "land," not "structure." *Id*. Thus, "[t]he policy cover[ed] *land* which is vacant." *Id*.

The reasoning in *Cotton Estates* is sound.[5] Hence, it is this Court's opinion that "vacant land" within the context of Gardner's homeowners' insurance policy does not mean land that contains artificial structures—whether or not the structures are abandoned, unoccupied, or unused. When "vacant" modifies the word "land," that is simply not how the word is understood in its "general and ordinary" sense. *Id.*

The Court also rejects the Mortons' position that the term "vacant" is ambiguous and must be construed in favor of the insured. (Docket No. 27 at 17). Indeed, several jurisdictions have similarly interpreted this term within the insurance context. For example, the Supreme Judicial Court of Massachusetts, holding that an insurance company did not have a duty to defend and indemnify insureds for losses asserted by a minor who was injured while playing on an abandoned structure on insureds' land, reasoned:

---

[5] The Mortons assert that Liberty Mutual's reliance on *Cotton States* is misplaced, but they do not provide case law in support of a different legal view of the term "vacant." (Docket No. 27 at 18-20).

> The term at issue in this policy is "vacant land." The Gomezes argue that, because the term could refer to land that is unoccupied or unused, as well as land without a structure, the judge correctly allowed their motion for summary judgment. We do not agree. Although this may be the meaning of "vacant" in some contexts, when land is described as vacant, this ordinarily means that there is no structure or building on it. A reasonably intelligent person would understand the term "vacant land" to mean the land is free of permanently affixed structures and would conclude that a lot of land with an abandoned building on it is not vacant.

*Citation Ins. Co. v. Gomez*, 688 N.E.2d 951, 952-53 (Mass. 1998). Courts in California, Utah, and Louisiana have reached similar conclusions. *See Bianchi v. Westfield Ins. Co.*, 236 Cal. Rptr. 343, 346 (Cal. Ct. App. 1987) ("beneficial use or improvement of untenanted land renders it nonvacant, particularly if the use has accompanied the introduction of artificial structures"); *Dawson v. Dawson*, 841 P.2d 749, 751 (Utah. Ct. App. 1992) (land is not vacant where it has structures that do not appear naturally); *Foret v. La. Farm Bureau Cas. Ins. Co.*, 582 So.2d 989, 990 (La. Ct. App. 1991) ("'[v]acant' is . . . not synonymous with 'uninhabited'").

The Mortons' argument that *Bianchi*, 236 Cal. Rptr. at 343, is distinguishable is likewise unpersuasive. Bianchi had built a dam and reservoir on the property in question, which led to the damage for which he was seeking to hold his insurer liable. *Id*. at 343-44. In determining the meaning of "vacant land," the court held that "the beneficial use or improvement of untenanted property renders it nonvacant, particularly if the use has accompanied the introduction of artificial structures." *Id*. at 346. The Mortons argue that because Gardner himself did not build the artificial structures on the Pennsylvania Property, and because the artificial structures had nothing to do with the incident, *Bianchi* should not apply. However, *Bianchi* does not hold that either of these qualifications is dispositive to the conclusion of whether land is vacant—all that *Bianchi* requires is that beneficial use of the property has been undertaken. *Id.*

Despite a lack of Pennsylvania authority directly on point, this Court believes that Pennsylvania courts would interpret this language in the same manner. In *Federal Kemper*

*Insurance Co. v. Derr,* the Pennsylvania Superior Court considered the same policy language in the context of whether a homeowners' insurance policy provided coverage for an occurrence on a private road adjoining the property. 563 A.2d 118, 119-20 (Pa. Super. Ct. 1989). The insured argued that the term "vacant land" was ambiguous and that the private road was vacant land because no structures were erected upon it. *Id*. at 121. The court rejected this interpretation, holding that even if "vacant land" was ambiguous, only those ambiguities which fall into the scope of the parties' intent are to be construed against the insurer. *Id*. at 121-22 (citing *Standard Venetian Blind Co*., 469 A.2d at 563). The court found that there was no evidence the parties had intended to insure the private road, and it would be a "stretch [to construe] the ambiguity in the term 'vacant land owned by [the insured]' so far as to encompass an easement over a private road[, as that] would in effect rewrite the contract of the parties." *Id*. at 122.

Finally, this Court's construction is consistent with both the definition of "vacant" in Black's Law Dictionary and the Policy's use of the term "vacant" in other contexts. Black's defines "vacant" as "[a]bsolutely free, unclaimed, and unoccupied <vacant land>" and provides that "[c]ourts have sometimes distinguished *vacant* from *unoccupied*, holding that *vacant* means completely empty while *unoccupied* means not routinely characterized by the presence of human beings." VACANT, Black's Law Dictionary (11th ed. 2019) (emphasis in original). In addition, when the term "vacant" appears elsewhere in the Policy, it modifies the word "dwelling," not "land." (*See* "Liberty Mutual Insurance Policy," Docket No 29-5 ("This exclusion applies only while the dwelling is vacant, unoccupied or being constructed . . . .")). "Vacant land" in this context means something different than "vacant dwelling," and the definition that the Mortons want "vacant land" to have ("unoccupied") is the meaning that the Policy itself applies to "vacant dwelling." If a dwelling or building is unused or "not routinely characterized by the presence of

15

human beings," it may be considered vacant. *See* VACANT, Black's Law Dictionary (11th ed. 2019). However, this Court agrees that for *land* to be considered vacant it must be "completely empty," *id.*, and the presence of artificial structures on the Pennsylvania Property precludes the Mortons' claim.

For all of these reasons, the Court holds the Pennsylvania Property does not constitute an "insured location" under the Policy and Gardner is not entitled to coverage for the Mortons' losses. Liberty Mutual is not liable to Gardner, and the Mortons cannot execute a judgment against Liberty Mutual.

### V.     Conclusion

Based on the foregoing, Liberty Mutual's Motion for Summary Judgment is granted, the Mortons' Motion for Summary Judgment is denied, and the Mortons' Writ of Execution is dismissed. An appropriate Order follows.

*s/Nora Barry Fischer*

Nora Barry Fischer
Senior U.S. District Judge

Dated: September 22, 2020

cc/ecf: Counsel of record